WILLIAM H. WARDER

*v.*

PAUL CORNELL et al.

*Filed at Ottawa November 20, 1882.*

1.   SPECIFIC PERFORMANCE—*refused after great delay and default, unexplained.*   A court of equity will not enforce the specific performance of a contract which has become stale, or where the complainant himself is in default, when no sufficient excuse appears for the delay or for the default.

2.   SAME—*estoppel by party's acquiescence in claims of others.*   Where a purchaser of land thirty years before filing his bill for a specific performance, not having made any payments for the same, stands by and sees others

who have bought and paid for the land make valuable and costly improvements thereon, and allows others to purchase, making no objections, and interposing no claim to the property, during all which time he pays no taxes or assessments on the same, and takes no legal steps to assert his supposed rights, and does not call on those occupying the same and assert his ownership, or call for an account of the rents and profits, and in his bill gives no excuse for his delay and conduct, he will not be entitled to equitable relief, and his bill will be properly dismissed.

3. NOTICE—*what is given by the records.* Subsequent purchasers of land, in the absence of express notice of latent equities in another than their grantors, can only be affected by such legal consequences as may be fairly drawn from the record itself; and when such records show that the claim of a prior purchaser has been cut off and defeated by a sale or foreclosure, or by a forfeiture of his contract, or of the contract of his vendor, such subsequent purchasers will have the right to rely on what is thus disclosed.

4. PURCHASER—*rights of, defeated by sale under foreclosure against his vendor, not revived by his vendor's subsequent purchase.* A and B, being the owners of land, contracted to sell the same to C, who afterwards contracted to sell the undivided three-eighths of the same to D. A and B gave deeds of trust on the same land to E, to secure a debt due to a bank, subject to their contract with C. The bank foreclosed these deeds of trust, making A and B, and C and D, and others, parties, in which bills were sought a decree for the balance of the purchase money due under the contract of sale from A and B to C, and to foreclose and bar all claims of the defendants to the land under such contract, and a decree was entered accordingly, under which the lands were sold, and from which sale no redemption was had. Long after the redemption had expired, C, by consecutive purchases, acquired reconveyances for a considerable portion of the land sold: *Held,* that by the foreclosure sale the rights of C, under his contract of purchase from A and B, were cut off and barred, which also defeated D's claim, and that the subsequent repurchase of some of these lands by C did not revive D's rights in the property which had been thus cut off.

5. CONTRACT OF SALE—*what is a declaration of forfeiture.* Where a contract for the sale of land provides that if the purchaser fails to perform any of his covenants the vendor or his assigns shall have the right to declare the contract null and void, a sale by such vendor or his grantee, for a valuable consideration, to another party, is in effect a declaration of forfeiture of the purchaser's contract.

APPEAL from the Circuit Court of Cook county; the Hon. M. F. TULEY, Judge, presiding.

Mr. JOHN V. LE MOYNE, and Mr. WILLIAM BURRY, for the appellant :

To make a decree of strict foreclosure binding, it is necessary that some confirmatory order be entered after the expiration of the period limited for redemption, declaring the title vested in the proper persons. 2 Daniell's Ch. Prac. *996; *Mulvey* v. *Gibbons,* 87 Ill. 381.

As to what *laches* will defeat equitable relief, and what state of facts will excuse, counsel cited *Hamilton* v. *Rook,* 62 Ill. 139; *Cox* v. *Montgomery,* 43 id. 110; *Hallesy* v. *Jackson,* 66 id. 139; *Michaud* v. *Girod,* 4 How. 561; *Boom* v. *Chiles,* 10 Pet. 177; *Johnson* v. *Diversey,* 82 Ill. 446; *Harper* v. *Ely,* 56 id. 179.

Such a contract as this, it being a joint speculation in land, part of the partners furnishing all the cash payments and another his services, etc., the profits of the adventure, after paying the purchase money, to be divided between the different partners, is a valid act, and may be enforced. *Morrill* v. *Colehour,* 82 Ill. 618; *Marshall* v. *Perry,* 90 id. 289; *Marshall* v. *Peck,* 91 id. 187; *Honore* v. *Hutchins,* 8 Bush, 689.

No man can declare a forfeiture on a contract unless he is then in a position, and ready and willing, to carry out the contract on his part. *Peck* v. *Brighton Co.* 69 Ill. 200; *Bishop* v. *Newton,* 20 id. 178; *Brown* v. *Cannon,* 5 Gilm. 174; *Baker* v. *Bishop Hill Colony,* 45 id. 270; *Mix* v. *Beach,* 46 id. 311; *Iglehart* v. *Gibson,* 56 id. 88.

The decree of foreclosure was set aside by the acts of the parties. At different times parcels of this land were purchased at the terms fixed by the decree of foreclosure. 2 Jones on Mortgages, secs. 1265, 1569; *Smalley* v. *Hickok,* 12 Ver. 163.

Mr. E. S. WILLIAMS, for the appellees Farwell and others :

The decrees of strict foreclosure, in the absence of any redemption, were sufficient to cut off the rights of appellant,

even without any confirmatory decree. *Mulvey* v. *Gibbons,*
87 Ill. 367.

The sale of the land by Cornell after default in payment,
was a clear and unequivocal declaration of his prior contract
of sale. *Warren* v. *Richmond,* 53 Ill. 54; *Bostwick et al.* v.
*Hess et al.* 80 id. 145.

The appellant's rights were cut off under the foreclosure
decrees of 1861. He was a party defendant to that suit,
and served with process, but made no defence and paid no
attention to the matter. Those decrees were, as to him, con-
clusive. *Thomson* v. *Morris,* 57 Ill. 334; *Feaster* v. *Fleming,*
56 id. 457; *Osgood* v. *Blackman,* 59 id. 265; *Mulford* v.
*Stalzenback,* 46 id. 304; *Stempel* v. *Thomas,* 89 id. 146; *Chi-
cago, Alton and St. Louis R. R. Co.* v. *Holbrook,* 92 id. 297.

*Laches* for twenty-four years, unexplained, will bar this
action. *Hough* v. *Coughlin et al.* 41 Ill. 130; *Walker* v. *Car-
rington et al.* 74 id. 472; *Munn et al.* v. *Burges,* 70 id. 618;
*Williams* v. *Rhodes et al.* 81 id. 588; *Sloan* v. *Graham,* 85
id. 30; *Hamilton* v. *Lubukee,* 51 id. 415; *Kellogg* v. *Wilson,*
89 id. 357; *Dempster et al.* v. *West,* 69 id. 614; *McHaney*
v. *Schenck,* 88 id. 258; *Rose* v. *Swann,* 56 id. 40; *Cox* v.
*Montgomery,* 36 id. 396; *Brink* v. *Steadman,* 70 id. 241;
*Thompson* v. *Brunn,* 46 id. 125; *McLaurie* v. *Barnes,* 72
id. 77.

Messrs. HUTCHINSON & LUFF, for the appellee Samuel D.
Ward:

The interest of appellant in the land in question was abso-
lutely divested by the decrees of strict foreclosure in favor of
the Western Bank of Scotland. He was a party to the suits,
and regularly served with process. *Chestnut* v. *Marsh,* 12 Ill.
173; *Buckmaster* v. *Rider,* id. 207; *Wimberly* v. *Hurst,* 33
id. 166; *Feaster* v. *Fleming,* 56 id. 457; *Hobson* v. *Ewan,* 62
id. 146; *Mulvey* v. *Gibbons,* 87 id. 381; *Stempel* v. *Thomas,*
89 id. 146.

Appellant's claim is stale, and barred by *laches*.   *Hough* v. *Coughlan*, 41 Ill. 130; *Gibson* v. *Rees*, 50 id. 383; *Walsh* v. *Brennan*, 52 id. 193; *Fitch* v. *Boyd*, 55 id. 307; *Rose* v. *Swann*, 56 id. 37; *Phelps* v. *Illinois Central R. R. Co.* 63 id. 468; *Hallesy* v. *Jackson*, 66 id. 139; *Carpenter* v. *Carpenter*, 70 id. 457; *Brink* v. *Steadman*, id. 241; *Williams* v. *Rhodes*, 81 id. 571; *O'Neal* v. *Boone*, 82 id. 589; *Castner* v. *Walrod*, 83 id. 171; *Sloan* v. *Graham*, 85 id. 26; *Kellogg* v. *Wilson*, 89 id. 357; *Marshall* v. *Perry*, 90 id. 289; *Lequatte* v. *Drury*, 101 id. 77.

Messrs. LEAMING & THOMPSON, for a part of the appellees:

The unexplained *laches* in this case is a bar to the relief sought.   *Taylor* v. *Merrill*, 55 Ill. 54; *Kimball* v. *Parke*, 70 id. 553; *Marshall* v. *Perry*, 90 id. 289.

The other points and authorities appear substantially in the preceding briefs.

Mr. JUSTICE MULKEY delivered the opinion of the Court:

In October, 1874, Paul Cornell and the Cornell Watch Company filed in the circuit court of Cook county their petition, under what is known as the "Burnt Records act," to establish title to certain valuable lands lying in the suburbs of Chicago, namely, the west half and the south-east quarter of section 26, and the south-west quarter of section 23, town 38 north, range 14 east of the third principal meridian, being the same lands now in controversy.   William H. Warder and others were made defendants to the petition.   No process was ever issued or other steps taken in the cause till in October, 1880, when Warder appeared and filed an answer to the petition, and also a cross-bill, by which other persons were made parties to the controversy.   The original petition having finally been dismissed for want of prosecution, the cause was submitted and heard upon the cross-bill alone, resulting

in a decree dismissing the same for want of equity, and Warder, the appellant, brings the case here for review. By the present bill, which is in the nature of a bill for a specific performance, the appellant claims to be the equitable owner of an undivided three-eighths of the land in controversy, and seeks to have the title thereto established and declared to be in himself, and also to compel an accounting for the rents and profits, etc.

The evidence in the case is unusually voluminous, and, much of it, of a very unsatisfactory character. Upon certain important questions the testimony of the two principal witnesses, Warder and Cornell, is in direct, hopeless conflict. Nevertheless, out of this great mass of evidence there appear certain undisputed facts, of so material and conclusive a character as to relieve the case of many difficulties it would otherwise present.

On the 10th of November, 1855, or thereabouts, Paul Cornell, by means of three separate written contracts, became the purchaser of the lands now in controversy. Two of these contracts were between Cornell and William B. Ogden, and the remaining one between Edwin H. Sheldon and William B. Ogden, as executors, and William B. Ogden in his own right, and the said Paul Cornell. These contracts all bear date November 10, 1855, and leaving out of view the diversity with respect to the considerations, descriptions of the land, and the names of the parties, they are precisely alike. By their terms one-fourth of the consideration was to be paid in cash, and the residue in three equal installments, on the first days of November, 1856, 1857 and 1858, respectively, with interest from date, at the rate of six per cent per annum, to be paid annually on the first day of November of each year. The purchaser also covenanted and agreed to pay all taxes and assessments on the premises subsequent to 1855, and in the event the seller was compelled to pay any such taxes or assessments, the amount so paid was to be regarded and

treated as so much additional purchase money due from the purchaser to the seller. Upon the performance of these conditions the vendor was to make and deliver to the purchaser or his assigns a good and sufficient deed to the premises, with full covenants of warranty; and it was expressly provided that if Cornell, or his legal representatives or assigns, should fail to perform any or either of the covenants and undertakings on his part, the vendor, or his legal representatives, should have the right to declare the contract of sale null and void, and reclaim possession of the premises. The following payments are indorsed on said contracts, namely: On the first, $1139.50, November, 1855; $395, November, 1856; $587.08, November, 1858. On the second, $2000, November, 1855; $350, November, 1856; $541, November, 1858. On the third, $1146, November, 1855; $200.66, October, 1856; $297, November, 1858,—making, in the aggregate, $6679.65. These payments were made partly in cash and partly in negotiable paper.

On the same day the above contracts were executed, as claimed by appellant, but some considerable time afterwards, as contended by Cornell, the latter sold to appellant an undivided three-eighths of the lands purchased by him, as above stated, and at the time delivered to him a memorandum of the terms of the sale, bearing the same date of his own purchases, namely, November 10, 1855, of which the following is a copy, except that it does not contain a description of the lands as the original did, namely:

"CHICAGO, *November 10, 1855.*

"I have this day sold to William H. Warder, of the city of Chicago, an equal undivided three-eighths interest in the land purchased this day of W. B. Ogden and others, said lands being described as follows, &ast; &ast; &ast; at the same price and upon the same terms upon which I purchased of W. B. Ogden and others, reference for the price and terms of which is hereby

had to the contract between said Ogden and myself. The first payment, being one-eighth down, has not yet been paid by Mr. Warder, and is still due, to be paid on call.

[Signed.]                                          PAUL CORNELL."

By a similar contract, bearing the same date, Cornell sold, at the same rates and on like terms, two undivided eighths of the said lands to Marcus A. Farwell. All of the above contracts were duly recorded about the time of their execution, except the one from Cornell to Warder, which was not filed for record until the 27th of April, 1857.

Shortly after these sales to Cornell, to-wit, on the 28th of November, 1855, Ogden executed, subject to said contracts, a deed of trust to Hasbrook Davis and J. P. Girard Foster, for the use of J. C. Bancroft Davis and James Thompson, as assignees of the Western Bank of Scotland, on the said west half of said section 26, and upon all their rights and interests under the said contracts. On the 16th of December, 1860, Ogden and Sheldon, as executors, and Ogden in his own right, executed to the same parties and for the same purposes a like deed of trust on the south-east quarter of said section 26. The first of these trust deeds was recorded on the 18th of March, 1858, and the second on the 28th of December, 1860.

Default having been made in the payment of the purchase money under the Cornell contracts, except as heretofore stated, the Western Bank of Scotland, and others, on the 28th of December, 1860, filed in the Superior Court of Cook county two several bills against Cornell, Farwell, Warder, and others, by one of which they sought to obtain a decree for the balance of the purchase money due under the contract of sale from Ogden to Cornell, of the said west half of section 26, and to foreclose and forever bar all claims of the defendants to the same under said contract. By the other of said bills they sought a like decree with like effects as to the south-east

quarter of said section 26, under the contract of Ogden and Sheldon, as executors, with Cornell. On the 7th of October, 1861, decrees were obtained in both these cases, in pursuance of the prayers of the bills respectively, under which all the lands in controversy lying in section 26 were sold, from which sale it is conceded no redemption was ever made until the time for redemption had expired. Previous to this, to-wit, in September, 1858, Ogden conveyed, subject to his contract with Cornell, the south-west quarter of section 23 to Philo Doolittle, who, by warranty deed of the date of January 21, 1861, conveyed the same to Farwell, Cornell having previously, on the 6th of September, 1859, also conveyed the undivided three-fourths of the same land to Farwell, which deeds were all duly recorded, thus giving to the latter a perfect title of record to the said south-west quarter of section 23. The conveyance last referred to was in pursuance of an agreement between Cornell and Farwell, to the effect that the latter was to abandon all interest in and to the lands in section 26, and assume the payment of the balance due under the original contract between Ogden and Cornell on the land in section 23, which was something more than he would have been bound to pay under the original arrangement for his fourth interest in all the lands. In pursuance of this agreement Farwell fully paid the balance due on the land in section 23, which amounted to some $6000.

A few days before the execution of the conveyance just mentioned, to-wit, on the 3d of August, 1859, Cornell, for the consideration as expressed in the deed, conveyed to Charles H. Atkins the said west half of section 26, and on the 3d of September, 1861, for the consideration of $3500, as expressed in the deed, he also conveyed to Erastus S. Williams the south-east quarter of section 26, being the residue of whatever interest he may at that time have had in the lands originally purchased by him of Ogden and Sheldon, as executors, or of Ogden in his own right. Long after the

12—105 ILL.

time for redemption under the foreclosure proceedings, as heretofore stated, had expired, and before 1870, Cornell from time to time, as he was able to do so, purchased and obtained reconveyances, in small parcels, for a considerable portion of the land originally purchased by him in section 26, which, after holding for some years, he sold and reconveyed to other parties, when he finally became a bankrupt, and received his discharge as such on the 31st of August, 1878. Some time during the year 1864, Farwell sold and conveyed the south-west quarter of section 23 to the cemetery company for $16,000, which was not fully paid for till 1869.

It is not pretended that appellant ever paid or offered to pay anything whatever on the interest in the land purchased by him from Cornell. It is claimed, however, that the proceeds of the sale of the south-west quarter of section 23 to the cemetery company were used by Cornell and Farwell in redeeming the lands in section 26 from the sale under the foreclosure proceedings, as heretofore stated, and that the money thus obtained and used was a common fund belonging to appellant, Cornell and Farwell, in proportion to their respective interests in the land in controversy. But this is distinctly denied by Cornell and Farwell both, and we feel constrained to accept their version of the matter upon this question, as the claim of appellant is unsustained except by his own evidence.

It appears further, that as early as in 1868 those having interests in these lands commenced making valuable improvements upon them, and that this continued up to the time of filing the cross-bill in this case, without appellant's making an objection or interposing any claim to the property, so that at that time the improvements amounted to over a half million of dollars. Moreover, during all the period intervening between his purchase from Cornell and the filing of his cross-bill,—being a period of over twenty-five years,—he never paid, as we have just seen, a cent on his purchase, nor did

he, during all that period, pay, or offer to pay, any assessments or taxes whatever on the property, nor did he take any legal steps to enforce any supposable rights he had in the property, or call on those occupying it and claiming it as owners to account to him for the rents and profits, or otherwise assert any acts of ownership over it, and he does not even assign the slightest reason which the law recognizes for not doing. so. And yet, in the face of all these uncontroverted facts, he now asks that the contract made by him with Cornell over thirty years ago be specifically performed, as against persons who have in good faith bought the property, and spent hundreds of thousands of dollars in improving it, while he stood by looking on in silence, without objecting or interposing the slightest claim to the same! To allow the relief sought, under these circumstances, would be to wholly disregard all the well recognized principles relating to the law of specific performance. Nothing is better settled than that courts of equity will not enforce the specific performance of a contract which has become stale, or where the complainant himself is in default, where no sufficient excuse appears for the delay or for the default of the complainant, as is manifestly the case here.

But the bill is sought to be maintained upon the theory that the original transaction between Cornell, Warder and Farwell constitutes an express trust, against which the Statute of Limitations does not run, and that the various contracts and conveyances relating to these lands being of record, are constructive notice of such trust. But the fatal and conclusive objection to this theory is, that these contracts and conveyances which appear of record, so far from showing any trust or even community of interest between these parties, show the contrary. Subsequent purchasers, therefore, claiming through Cornell or his vendors, in the absence of express notice of latent equities, can only be affected by such legal consequences as may be fairly drawn from the record itself.

The question then recurs, what were the rights of Warder under the original contracts, and of which subsequent purchasers were bound to take notice? It is clear his rights were entirely subordinate to Cornell's, under the Ogden and Ogden and Sheldon contracts. Whatever, therefore, would cut off the rights of Cornell under these contracts, would also, of necessity, defeat Warder's claims to the land, whether he had performed his contract with Cornell or not. Now, it is clear, as we have already seen, that as to the land in section 26 Cornell never did pay for it, but, on the contrary, it was sold under the foreclosure proceedings to pay the purchase money, from which there was never any redemption; and by virtue of those proceedings the rights of Cornell and all other persons, including appellant, claiming under those contracts, were forever cut off and barred, and the fact that Cornell, years afterwards, repurchased with his own means some of these lands, could not and did not revive in appellant rights to the property which had been thus cut off. The record of these contracts further disclosed that Cornell, in his contract with Warder, expressly reserved the right to declare a forfeiture of it, and resume possession of the land, upon Warder's failure to make prompt payment of the purchase money, as therein provided, and that long after the purchase money was due and payable, according to the terms of the contract, Cornell, as heretofore shown, sold and conveyed, for a valuable consideration, the lands in controversy to other parties, which was in legal effect a declaration of forfeiture of Warder's contract with him, as he, by the express terms of that contract, had a clear right to do. It will be thus seen that the record not only negatives the idea of a trust, but shows upon its face, to all persons dealing with the property, that Cornell expressly reserved the right, in his contract with Warder, to declare a forfeiture of the same in default of payment, and that this right was fully exercised by him in making the sale and conveyance of the property

as just stated. And it also further appears, from the record, that a similar right was reserved to Ogden and his assigns in his contract with Cornell for the sale of the south-west quarter of section 23, and that such right was subsequently exercised by Philo Doolittle, the assignee of Ogden, by his absolute conveyance of the land to Farwell on January 21, 1861, as heretofore stated.

It thus clearly appears, from the record of these transactions, that whatever rights Warder may have had under his contract with Cornell, they have long since been forfeited, unless, perhaps, he was prepared to show the right of forfeiture, under the circumstances, was improperly exercised, and also a legal excuse for the extraordinary delay in bringing suit, which has clearly not been done, and, indeed, could not be done under the pleadings, as now framed.

But waiving all these matters, and assuming the pleadings were properly framed for such purpose, and coming right down to the extraneous proofs relied on to show an express trust, we think it manifest they are wholly insufficient for such purpose. The only evidence which we regard as tending to establish this theory of the case, is the testimony of the appellant himself, and upon all material points relating to this question he is flatly contradicted by Cornell, and his own conduct, for a period of more than twenty years, is, when tested by ordinary business experience and prudence, wholly inconsistent with the claim he now interposes. Besides this, the testimony of Farwell and others clearly shows that his theory is not sustained by the facts upon one of the most important points in it. In attempting to excuse himself for a total failure to pay any part of the purchase money, he claims the lands in section 26, which were sold under the foreclosure proceedings, were redeemed with the proceeds of the sale of the lands in section 23 by Farwell to the cemetery company, and that his share of such proceeds was more than sufficient to pay his ratable proportion of the purchase money

of all the lands in controversy. Now, the weight of evidence clearly shows, as we have already seen, there is not a word of truth in this hypothesis; and conceding the appellant to be in error about this, as he manifestly is, it is too clear to admit of serious discussion there can be no recovery in this case, and it is therefore useless to consider other questions discussed by counsel in their briefs.

The assumption that Warder, Cornell and Farwell were partners with respect to these lands, is not at all sustained by the evidence in this record, and the conduct of all the parties conclusively shows that no such relation existed between them, and that they never so understood it. The weight of evidence perhaps shows that Warder helped negotiate the original purchase of these lands, but he never contributed anything towards paying for them; and this is all the connection he ever had with the transaction, outside of his purchase from Cornell, which for more than twenty years, so far as any inference can be drawn from his conduct, he wholly abandoned. But suppose the transactions between these parties did constitute them partners originally, can it seriously be contended that after the lapse of twenty-five years or more a bill in equity will lie at the suit of a partner who has never contributed a single cent, either in money or labor, to such partnership, for the purpose of winding up the concern? We think not.

The judgment will be affirmed.

*Judgment affirmed.*